Teresa A. Blasberg (#105473)
BLASBERG & ASSOCIATES
526 N. Juanita Ave
Los Angeles, CA 90004
Phone: (213) 239-0364
Fax: (323) 661-2940

-and-

Gilbert L. Hamberg (*pro hac vice*)
1038 Darby Drive
Yardley, Pennsylvania 19067
Phone:  (215) 321-6909
Fax:  (215) 321-6909

Attorneys for Tucson Electric Power
Company and UNS Gas, Inc.

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: ) | Case No. 2:08-bk-28517-BR |
| ) | |
| AFC ACQUISITION CORP., a Delaware ) corporation, dba American Home, American ) Warehouse Plus, and American Furniture ) Company, ) | Chapter 11 |
| ) | RESPONSE OF TUCSON ELECTRIC POWER COMPANY AND UNS GAS, INC. TO THE DEBTOR'S OBJECTION AND MOTION TO DISALLOW THEIR SECTION 503(b)(9) CLAIM |
| Debtor. ) | |
| ) | |
| ) | Date:  July 15, 2009 |
| ) | Time: 10:00 a.m. |
| ) | Place: Courtroom 1668 |
| ) |      255 E. Temple, Los Angeles, CA 90012 |
| ) | |

Tucson Electric Power Company ("TEP") and UNS Gas, Inc., ("UNS"), two (2) of the operating

subsidiaries of UniSource Energy Corporation, by and through their undersigned counsel, file this

Response (the "Response") to the Objection and Motion to Disallow their Claim Under Section

503(b)(9) of the U.S. Bankruptcy Code (the "Code") for $38,568.50, dated June 15, 2009 (Docket

No. 216) (the "Objection"), filed by the above-captioned Debtor (the "Debtor"), and TEP and UNS

respectfully submit as follows:

**FACTS**

1. The factual allegations in this Response are set forth in the accompanying Affidavit of Carolina Villascuesa, Small Commercial Care Specialist Manager for TEP and UNS (the "Affidavit").

2. Regulated by the Arizona Corporation Commission (the "ACC"), TEP is a public utility which provides electricity to customers, including the Debtor, in Arizona, and UNS is a public utility which provides natural gas to customers, like the Debtor, in Arizona.

3. Prior to filing for Chapter 11 on November 2, 2008 (the "Petition Date") with the above-captioned U.S. Bankruptcy Court (the "Court"), the Debtor requested that TEP and UNS provide it with electricity at four (4) accounts and natural gas at one (1) account (collectively, the "Accounts"). Itemization (summary schedule and supporting invoices) of the unpaid charges owed to TEP and UNS as of the Petition Date is affixed at Exhibit 1 of the Affidavit.

4. TEP and UNS provided the electricity or natural gas to the Accounts in the ordinary course pursuant to their normal, monthly billing practices, invoices, due dates, and termination procedures, if applicable, and in the ordinary course of the Debtor's business. This electricity or natural gas was measured at the electric or gas meters located at the Debtor's premises. This electricity and natural gas was essential to the Debtor's business. Without the electricity and natural gas, the Debtor's business would have been disrupted severely, and this could have jeopardized the reorganization of the Debtor.

5. As set forth in Exhibit 1, the amount of electricity and natural gas which TEP and UNS provided to the Accounts during the twenty (20) days prior to the Petition Date, but which the Debtors have not paid yet, is $38,568.50. Electricity was $38,204.10. Gas was $334.40.

6. The electricity sold by TEP to the Debtor is "goods", as defined in Arizona Revised Statutes § 47-2105:

> (1) Goods means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid. . . .

(2) Goods must be both existing and identified before any interest in them can pass.

7. Once electricity passes through the flow meter (which measures the amount sold), then it travels through a network of electrical wires throughout the Debtor's premises, where the customer uses the electricity as an energy and power source to generate heat, air conditioning, power, and light at its buildings and for its equipment. Once measured, any one (1) kilowatt-hour of electrical energy is the same as any other kilowatt-hour of electrical energy, and any one (1) kilowatt of electrical power is the same as any other kilowatt of electrical power. Upon passing the meter at the customer's premises, electricity is a movable thing, which has been existing and identified (in terms of the number of kilowatts sold). An interest in the number of kilowatts sold passes to the customer once the electricity passes the meter. Once the number of kilowatt-hours and kilowatts were measured by the meters, then TEP was able to multiply same by the price per kilowatt-hour or per kilowatt and other charges (set forth in its tariff, duly approved by the ACC) to calculate the amounts due in Exhibit 1.

8. Once the electricity passed the meters at the Debtor's premises, TEP sold same to the Debtor, who bought same at that point; thus, TEP's electricity was measured, delivered, and identified in finite quantities. It is a substance which can be measured.

9. Pursuant to Arizona Revised Statutes § 47-2107 A, the sale of natural gas *per se* is a sale of goods. It reads: "A contract for the sale of . . . minerals or the like (including . . . gas) . . . is a contract for the sale of goods . . .". UNS' Section 503(b)(9) claim is for the sale of natural gas to a customer ***after*** the natural gas leaves the utility's system, travels through the utility's mains and pipes, passes the meter at the customer's premises, is consumed by the customer at its premises, and days (twenty) of charges accrue, as calculated at the applicable rate.

10. The sale of natural gas also complies with the definition of goods in A.R.S. Section 47-2105. Once the gas passed the meter at the Debtor's premises, UNS sold same to the Debtor, who bought same at that point; thus, TEP's gas was measured and delivered in finite quantities. It is a substance which can be measured and identified.

//

//

1

### ARGUMENTS

2

### A. __Introduction__

3

11.    Analyzing the Objection, it appears that the Debtor does not object to this claim for

4

$38,568.50 being an allowed, general, unsecured claim; rather, the objection is as to the priority.

5

That is, the Debtor objects solely to the claim being classified as an allowed, administrative expense

6

claim under Section 503(b)(9).

7

### B.  Section 503(b)(9):  Administrative Expense Priority for

8

### __Goods Received by Debtor 20 Days Prior to the Petition Date__

9

12.    Section 503(b)(9) provides:    After notice and a hearing, there shall be allowed,

10

administrative expenses . . . including –- the value of any goods received by the debtor within 20

11

days before the date of commencement of a case . . . in which the goods have been sold to the debtor

12

in the ordinary course of such debtor's business.

13

13.    Pursuant to In re Brown & Cole Stores, LLC, 375 B.R. 873, note 7, at 878 (9th Cir. BAP

14

2007), a vendor must satisfy these elements to assert a valid, Section 503(b)(9) claim:  (a) it must

15

have provided goods; (b) the debtor must have received the goods during the twenty (20) days prior

16

to the Petition Date; and (c) the goods must have been sold in the ordinary course of the debtor's

17

business.  Only something which is a "good" qualifies for the Section 503(b)(9) priority; whereas,

18

services do not.    In re Goody's Family Clothing, Inc., 401 B.R. 131 (Bankr. D. Del. 2009).

19

14.  Here, the Debtor requested that electricity or natural gas be connected at the Accounts, TEP

20

and UNS provided same in the ordinary course pursuant to normal, monthly billing, invoices, due

21

dates, and termination procedures, if applicable, and in the ordinary course of the Debtor's business.

22

This electricity and natural gas was measured at the meters located at the Debtor's premises and

23

calculated using normal, monthly invoices.  The electricity and natural gas were provided during the

24

twenty (20) days prior to the Petition Date.

25

15.  The Debtor admits the necessity for its utilities.  *See* the Debtor's Utilities Motion, dated

26

November 3, 2008, at 3 (Docket No. 3).  The utilities were essential to the continuation of the

27

Debtor's business.  Any interruption would have disrupted its operations severely and could have

28

jeopardized its reorganization.  Utility charges provided post-petition are granted administrative

1    expense priority as a matter of course.  In re Keydata Co., 12 B.R. 156 (Bankr. App. D. Mass. 1981);

2    In re Continental Airlines, Inc., 146 B.R. 520, 526 (Bankr. D. Del. 1992); and In re Criss, 85 B.R.

3    459 (Bankr. N.D. Ohio 1988).

4    **C.  Electricity Is a "Good"**

5    16.    The sale of electricity is a "good", payment for which is allowable under Section 503(b)(9).

6    'Goods' is undefined in Section 503(b)(9) of the Code, Section 101 (the general definitions statute)

7    of the Code, and the legislative history of Section 503(b)(9):  "the value of any goods received by a

8    debtor not later than within 20 days prior to the commencement of a bankruptcy case in which the

9    goods have been sold to the debtor in the ordinary course of the debtor's business is an allowed

10   administrative expense."    H.R. Rep. No. 109-31, at 146, April 8, 2005, *reprinted in* 2005

11   U.S.C.C.A.N. (109th Cong., 1st Sess.).

12   **i.  State Law Governs in Absence of Definition Under Code**

13   17.    State law is the substantive law applied to determine the origin, existence, and allowance of a

14   claim -- if the Code otherwise does not define a term.  In re Murgillo, 176 B.R. 524, 529 (9th Cir.

15   BAP 1994).  State law controls the definition of property and interests in property.  Barnhill v.

16   Johnson, 503 U.S. 393, 398 (1992); In re Maurer, 140 B.R. 744, 745 (D. Mn. 1992); and In re

17   Mandaly Shores Co-op Hous. Ass'n, 54 B.R. 632, 635 (Bankr. M.D.Fl. 1984) ("the underlying right

18   to a payment is determined by substantive local law.").  Where the Code does not define a term, then

19   a Bankruptcy Court is to refer to state law.  In re Columbia Gas Trans. Co., 37 F.3d 982, 984 (3rd

20   Cir. 1994).

21   18.    Pursuant to 28 U.S.C. §959(b), a debtor has to comply with the same laws of the state in

22   which its property is located as do non-debtors.  Midlantic Nat'l Bank v. New Jersey Dept. of Env't

23   Protec., 474 U.S. 494, 505 (1986) (trustee cannot abandon property without complying with state,

24   environmental laws); In re American Coastal Energy, Inc., 399 B.R. 805, 810-12 (Bankr. S.D. TX.

25   2009) ("debtors are no different from any citizen in that they must comply with state and federal

26   laws."); In re Lauriat's, Inc., 219 B.R. 648, 649 (Bankr. D. Mass. 1998) (debtor cannot conduct

27   going out of business sales in violation of state laws); and In re White Crane Trading Co., 170 B.R.

28   694, 702 (Bankr. E.D. Cal. 1994) ("Congress has . . . required that every debtor . . . manage and

operate the debtor's property and business in compliance with state laws –- good, bad, and indifferent –- that apply outside of bankruptcy").

### ii.  Arizona Law and Goods

19.  As TEP is located in Arizona, and the Debtor received this electricity in Arizona during this twenty (20) day period, Arizona law controls whether electricity is a "good".

20.  There is only one definition of 'goods' under Arizona law:  in the context of what something has to be to qualify for coverage under the Arizona Uniform Commercial Code; namely, Arizona Revised Statutes § 47-2105 A and B  (defined above in Paragraph 6).  No Arizona case has ruled whether electricity is a "good" under A.R.S. Section 47-2105.

### iii.  Legal Authorities:  Electricity is a "Good"

#### a .  The Generation of Electricity is Manufacturing

21.  The actual process of creation of electricity by an electric utility; i.e., the use of fossil fuels fed into a generation plant to create a force, which then is delivered along wires to customers through the utility's plant and equipment, which then is delivered to the customer's premises -- once measured at a meter, is manufacturing; therefore, electricity is a manufactured good, not a service. Courts have so ruled in multiple states:  *KY:*  Revenue Cabinet v. Kentucky-American Water Co., 997 S.W.2d 2 (Ky. 1999); City of Louisville v. Howard, 208 S.W.2d 522 (Ky. 1947) ("[t]he generation of electricity is manufacturing."); Dep't of Revenue ex rel. Luckett v. Allied Drum Serv., Inc., 550 S.W.2d 564 (Ky. App. 1977), *aff'd.* 561 S.W.2d 323 (Ky. 1978); and Kentucky Elec. Co. v. Buechel, 143 S.W. 58, 60 (Ky. App. 1912); *LA:*  State v. New Orleans Ry. & Light Co., 40 So. 597, 598 (La. 1906) ("electricity may be a product of manufacture"); *MASS:*  Boston Gas Co. v Assessors of Boston, 137 N.E. 2d 462, 469-70 (Mass. 1956); *NY*:  People v. Wemple, 29 N.E. 808, 811 (N.Y. 1892) (electricity "may be, and in fact is, measured, and sold in determinate quantities at a fixed price. . . "); and *PA:*  Commonwealth v. N. Elec. Light & Power Co., 22 A. 839 (Pa. 1891).

#### b .  After the Meter at the Customer's Premises, Electricity
#### Enters the Stream of Commerce and is Goods or a Product

22.  TEP's Section 503(b)(9) claim is for the sale of electricity by an electric utility to a customer after the electricity leaves the generating plant, travels across the utility's distribution and

transmission system, passes the meter at the customer's premises, is consumed by the customer at its premises, and days (twenty) of charges accrue, as calculated at the tariff rate.  The instant dispute is not a case about a tort, stray voltage, an electrocution, which occurs ***prior*** to the electricity reaching the meter at the customer's premises.  Once electricity passes the meter at the customer's premises, then it is goods or a product.

23.   This learned treatise established the essence of what is electricity:  A. F. Curtis, <u>The Law of Electricity</u> 6-7 (1915) (copy affixed at Exhibit A; *see also* Chapter 1, Sections 1 to 3, for a general discussion of the nature of electricity):

> Electricity, being invisible to the senses, cannot be handled in the same manner as potatoes, furniture or other articles of personal property.  From its imperceptibility to the senses, it might be claimed that it was not property . . . On the other hand, it is continuously bought, sold, ***measured, and delivered*** as efficiently as wheat or any other commodity.  In spite of its invisibility, electricity is considered in law as personal property subject to ownership, sale and disposal as inanimate objects.  It has a ***substance*** which may be ***measured***.  And one, having ownership and possession of an electric wire, may properly be said to have possession of the electricity with which the wire is charged. (emphasis added)

24.   There is great similarity between the Curtis analysis of electricity and the requirements in A.R.S. Section 47-2105 for something to be goods.  A kilowatt of electricity beyond the metering point is the same as any other kilowatt of electricity.  That is how an electric meter operates.  Once electricity passed through the electric meters at the Debtor's premises, TEP delivered and then measured an item equivalent to every other like unit; therefore, TEP has measured a substance sold by the number of kilowatt hours.  Thus, this electricity was a substance which was measured and delivered, existing and identified.  Consequently, electricity is "goods" under A.R.S. Section 47-2105.

25.   According to L. Anderson, 2 <u>Uniform Commercial Code</u> (3rd ed. 2004 rev.) § 2-105:37, at 141 ("[w]hatever can be measured by a flow meter has 'movability' as that term is used in

connection with the definition of goods."). By employing flow meters to calculate the $38,204.10 of electricity provided to the Debtor, TEP's Section 503(b)(9) claim qualifies as a "good".

### c. **Published Authorities**

26. In a variety of contexts, e.g., personal injury cases for injuries due to electrocution, courts have held utilities liable under a variety of circumstances. Imposing warranties available once an item either is goods, as provided under the Uniform Commercial Code (the "UCC"), or a product, as provided under state strict liability tort statutes, courts have found that once electricity enters the stream of commerce (after it has passed the metering point at the customer's premises), then electricity constitutes either goods under the UCC) or a product (under state strict liability tort statute). Either way, electric utilities find themselves liable for potential damages as a result of such classifications in such negligence actions. Now that the U.S. Congress enacted Section 503(b)(9) -- with its key term being "goods", it would be extremely incongruous to rule that while for purposes of negligence actions, electricity is goods or a product, and not a service; however, for purposes of the Code, electricity is a service and not goods. Further, in a variety of non-negligence cases, courts have found electricity to be goods, a product, a commodity, or property.

27. The United States Supreme Court has held that electrical power is property. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 330, 56 S.Ct. 466, 475 (1936): "the electric energy thus produced constitute property".

28. According to the Restatement (Third) of Torts: Product Liability §4 Comment D, at 152-158 (Tentative Draft No. 2, 1995) (defining a product as "something distributed commercially for use or consumption"), electricity constitutes intangible, personal property: "the weight of authority supports extending strict liability to electrical utilities. Once the electricity passes through the customer's meter, it is considered a product in the stream of commerce, and is subject to strict liability."

29. Cases from other states have ruled that either: (a) once electricity passes the meter at the customer's premises, then it is goods; or (b) the sale of electricity is a product or a commodity. Once electricity passes through the meter and flows through the electric wires into the customer's premises, it is a movable thing, which has been existing and identified (in terms of the number of

kilowatts sold). An interest in the number of kilowatts sold passes to the customer once the electricity passes the meter.

30. Under California law, electricity is goods. Interpreting the definition of goods under the laws of California and Washington, one United District Court, in an appeal of a bankruptcy case, so held. In re Pac. Gas & Elec. Co., 271 B.R. 626, 638-40 (N.D. Cal. 2002) (once electricity has been metered, it becomes a product or goods; electricity is a thing movable at time of identification to contract for sale; once the amount is metered, it becomes identifiable).

31. So have California state courts. Mancuso v. S. California Edison Co., 283 Cal. Rept. 300, 307-308 (Cal. Ct. App. 1991); Pierce v. Pacific Gas & Elec. Co., 212 Cal. Rept. 283, 290-291 (Cal. Ct. App. 1985); and Terrace Water Co. v. San Antonio Light & Power Co., 82 P. 562 (Cal. Ct. App. 1905) (under California Civil Code, electricity is property.)

32. This is the law elsewhere too. *CO*: Smith v. Home Light & Power Co., 734 P.2d 1051, 1054-1055 (Col. 1987); *CT*: Carbone v. Connecticut Light & Power Co., 482 A.2d 722, 723 (Ct. Super. 1984); *GA*: Monroe v. Savannah Elec. & Power Co., 471 S.E.2d 854, 855-856 (Ga. 1996) ("electricity is a product. . . . [I]t can be produced, confirmed, transmitted . . . and distributed in the stream of commerce."); *IL*: Genaust v. Illinois Power Co., 343 N.E.2d 465, 469-470 (IL. 1976); People v. Menagas, 11 N.E. 2d 403, 405 (IL. 1937) (electricity is a product; its theft is a crime; "electricity is produced, stored, measured, bought, and sold, and may be moved from place to place in containers and cables, and is brought into being as a product, it exists in modern life as a commodity."); Elgin Airport Inn v. Commonwealth Edison Co., 410 N.E.2d 620, 624 (Ill. App. Ct. 1980) ("electrical energy is artificially manufactured, can be measured, bought and sold, changed in quantity or quality, delivered wherever desired"); Cratsley v. Commonwealth Edison Co., 347 N.E.2d 608 (Ill. App. Ct. 1976); *IN*: Hedges v. Pub. Serv. Co. of Indiana, Inc., 396 N.E.2d 933, 935-936 (Ind. Ct. App. 1979); Helvey v. Wabash County REMC, 278 N.E.2d 608, 609-610 (Ind. Ct. App. 1972) (electricity is a movable, because of the "monthly reminder from the electric company of how much current has passed through the meter. Logic would indicate that whatever can be measured in order to establish the price to be paid would be indicative of fulfilling both the existing and movable requirements of goods."); *KY*: C.G. Bryant v. Tri-County Elec. Member. Co., 844 F.

1  Supp. 347, 349-52 (W.D. Ky. 1994) (electricity is a product after it is sold when it passes through

2  the meter; the majority of state courts agree; a producer of electricity is like "other sellers of

3  goods"); G&K Dairy v.Princeton Elec. Light Board, 781 F.Supp. 485, 490 (W.D. Ky. 1991) (stray

4  voltage which did not pass through the meter is not goods; however, court recognized other cases

5  which ruled that electricity past the meter is goods); Kentucky Elec. Co. v. Buechel, 143 S.W. 58,

6  59-60(Ky. Ct. App. 1912) (generation of electricity is manufacturing; electricity is sold by quantity

7  and measured by a meter); *NEB*:  State v. Interstate Power. Co., 226 N.W. 427, 433 (Neb. 1929)

8  ("We buy it and pay for it and determine the amount of our purchases by definite and well-

9  understood 'standard'.  Brought into being as a product, it exists in modern life as a commodity.");

10 *NJ*:  Sixty-Seven S. Munn v. Board of Public Util. Comm'r, 147 A. 735 (NJ 1929) (electricity is a

11 product or a commodity); Aversa v. Pub. Serv. Elec. & Gas Co., 451 A.2d 976, 979-980 (NJ Super.

12 Ct. 1982); *OH*:  Cincinnati Gas & Elec. Co. v. Goebel, 502 N.E.2d 713, 714-715 (Ohio Mun. Ct.

13 1986); *PA*:  Schriner v. Pennsylvania Power & Light Co., 501 A.2d 1128, 1134 (Pa. Super. Ct. 1985)

14 (electricity becomes a product "once it passes through the customer's meter and into the stream of

15 commerce."); Bellotti v. Duquesne Light Co., 4 UCC Rep. Serv. 2d 1393, 1394-1395 (Pa. Ct.

16 Comm. Pleas 1987); *TX:*  Houston Lighting & Power Co. v. Reynolds, 765 S.W.2d 784, 785 (Tex.

17 1989) ("[e]lectricity is a commodity, which, like other goods, can be manufactured, transported, and

18 sold. . . . Electricity is a form of energy that can be made or produced by man, confined, controlled,

19 transmitted and distributed to be used as  an energy source for heat, power and light."); Bailey v.

20 Gulf States Util. Co., 27 S.W.3d 713, 718 (TX. Ct. Appls. 2000); *WV:*  Fickeisen v. Wheeling Elec.

21 Co., 67 SE 788, 789 (W. Va. 1910) (electricity "is personal property capable of sale. . . . [I]t had

22 substance so far as to be measured."); and *WI*:  Ransome v. Wisconsin Elec. Power Co., 275 N.W.2d

23 641, 643 (Wis. 1979) ("electricity itself, in the contemplation of the ordinary user, is a consumable

24 product."). Thus, TEP's Section 503(b)(9) claim is well founded in fact and legal support.

25             **d.  The Minority View**

26     33.  An unpublished decision, In re Samaritan Alliance, LLC, 2008 WL 2520107 (Bankr. E.D.

27 KY. 2008) (copy affixed at Exhibit B), ruled that under Section 503(b)(9), the sale of electricity is a

28 service and not goods.  Its sole rationale (no doubt why it is unpublished) was: "section 503(b)(9) is

1    not applicable here and that the electricity provided is more properly characterized as a 'service'".

2    *Id.*, at 3.  Further, as the utility's claim was for $35,067.59, the costs of litigation no doubt

3    influenced its decision not to appeal.

4       34.  <u>Samaritan</u> readily is distinguishable.  First, it had no rationale.  Second, it made no attempt to

5    distinguish away any of the many, contrary arguments set forth herein, and the supporting,

6    published, legal authorities.   It ignored contrary precedent from two (2) prior, published decisions of

7    U.S. District Courts in Kentucky: <u>C.G. Bryant v. Tri-County Elec. Member. Co.</u>, 844 F. Supp. 347,

8    349-52 (W.D. Ky. 1994), and <u>G&K Dairy v. Princeton Elec. Light Board</u>, 781 F.Supp. 485, 490

9    (W.D. Ky. 1991).   It also ignored a well-established legal principle of Kentucky law that the

10   generation of electricity by an electric utility at a generating plant is goods or products.  <u>Kentucky</u>

11   <u>Elec. Co. v. Buechel</u>, 143 S.W. 58, 60 (Ky. App. 1912); *see also* <u>Revenue Cabinet v. Kentucky-</u>

12   <u>American Water Co.</u>, 997 S.W.2d 2 (Ky. 1999); <u>City of Louisville v. Howard</u>, 208 S.W.2d 522 (Ky.

13   1947); and <u>Dep't of Revenue ex rel. Luckett v. Allied Drum Serv., Inc.</u>, 550 S.W.2d 564 (Ky. App.

14   1977), *aff'd.* 561 S.W.2d 323 (Ky. 1978).

15       35.  Third, an unpublished decision from a Kentucky Bankruptcy Court has no precedential value

16   before this Court, a California Bankruptcy Court.  <u>In re Mortgage Realty Trust Co.</u>, 123 B.R. 626,

17   630 (Bankr. C.D. Cal. 1991) ("Unreported bankruptcy court decisions have very little weight as

18   precedent.  When a bankruptcy judge wants a decision to serve as precedent, the judge publishes the

19   decision.  Unpublished decisions do not establish case law, and do not serve as precedent.").  *See*

20   *also* <u>U.S. v. Hiatt</u>, 527 F.2d 1048, 1051 (9th Cir. 1976) (unpublished decisions are "too sketchy and

21   unauthoritative to permit us to hold them controlling."); <u>Ileto v. Glock, Inc.</u>, 194 F. Supp.2d 1040,

22   1057, n. 12, (C.D. Cal. 2002) (court "cannot rely on such a summary conclusion in an unpublished

23   opinion as precedent"); and <u>In re Antablian</u>, 140 B.R. 534 (Bankr. C.D. Cal. 1982).

24       36.  Under some New York law, the sale of electricity is a service and not goods.  <u>Bowen v.</u>

25   <u>Niagara Mohawk Power Co.</u>, 590 N.Y.S.2d 628, 631 (N.Y. App. Div. 4th Dept. 1992); and <u>U.S. v.</u>

26   <u>Con. Edison Co.</u>, 590 F. Supp. 266 (S.D.N.Y. 1984).  Neither case attempted to distinguish any of

27   the many, contrary arguments set forth herein, and the supporting, published, legal authorities.

28

1  Further, these cases overlooked earlier New York precedent: <u>People v. Wemple</u>, 29 N.E. 808 (N.Y.

2  1892) (the generation of electricity is manufacturing).

3      37.  A few courts have ruled that electricity is not goods under the Uniform Commercial Code:

4  ***MASS***:  <u>New Balance Athletic Shoe v. Boston Edison</u>, 29 UCC Rep. Serv. 2d 297 (Mass. Super. Ct.

5  1996); ***NC***:  <u>Lilley v. Cape Hatteras REC</u>, 13 UCC Rep. Serv. 82, 84 (E.D. N.C. 1990); ***OH:***  <u>Otte v.

6  Dayton Power & Light Co.</u>, 523 N.E. 2d 835, 838-840 (Ohio 1988); and ***TX***:  <u>S.W. Elec. Power v.

7  Grant</u>, 73 S.W.3d 211 (TX 2002) (curiously, court made no mention of its earlier decision in

8  <u>Houston Lighting & Power Co. v. Reynolds</u>, 765 S.W.2d 784, 785, that electricity is a commodity).

9  These cases did not distinguish any of the contrary arguments set forth herein and the supporting,

10  published, legal authorities.

11          **e.  <u>Uniformity in Utility Transactions:  Natural Gas & Water</u>**

12      38.  There is a policy reason for the sale of electricity to be deemed goods:  to promote uniformity

13  of results in the sale of all utilities; namely, electricity, natural gas, and water.  Since "[m]ost cases

14  dealing with other utilities, such as gas and water, conclude that they are goods, . . . [r]eaching the

15  same result with electric utility contracts accomplishes the objective of uniformity in public utility

16  transactions."  3 <u>Bender's UCC Service</u> §1.03[4], at 1-62 (2006 ed.).

17      39.  The sale of natural gas is goods under Section 503(b)(9).  <u>In re Plastech Engineered Prod.,

18  Inc.</u>, 397 B.R. 828, 839 (Bankr. E.D. Mich. 2008), held that under Section 503(b)(9), the sale of

19  natural gas is goods.  Besides UCC Sections 2-105(1) and 2-105(2) (general definition of goods),

20  non-Arizona cases holding that the sale of natural gas is goods also have focused upon UCC Section

21  2-107 A, cited above in Paragraph 9.  While no case has ruled whether natural gas is goods under

22  Arizona law, courts elsewhere have held that it is:  ***CO***:  <u>Ky Energy, Inc. v. Great West. Sugar Co.</u>,

23  698 P.2d 769, 778, n. 10 (Col. 1985), <u>cert. den</u>. 472 U.S. 1022 (1985); <u>Amoco Production v. W.

24  Slope</u>, 754 F.2d 303, 307 (10th Cir. 1985); ***KS***:  <u>Sunflower Elec. Co-op v. Tomlinson Oil Co.</u>, 638 P.

25  2d 963, 969 (KS. Ct. App. 1981); ***MS***:  <u>So. Nat. Gas v. Pursue Energy</u>, 781 F.2d 1079, 1081, n. 3 (5th

26  Cir. 1986); ***MT***:  <u>In re MSR Explo.</u>, 147 B.R. 560, 569 (Bankr. D. Mt. 1992); ***ND:***  <u>JN Explo. v.

27  Western Gas Resources</u>, 153 F. 3d 906, 912 (8th Cir. 1997); ***OK***:  <u>R.J.B. Gas Pipeline Co. v. Col.

28  Interstate Gas Co.</u>, 813 P.2d 14, 26 (Okla. App. 1990); <u>Manchester Pipeline v. Peoples Natural Gas,

862 F. 2d 1439, 1444 (10th Cir. 1988); **PA**: Gardiner v. Phila. Gas Works, 197 A. 2d 612, 614, n. 8 (Pa. 1964); and **TX**: Aquila Southwest Pipeline v. Harmony Explo., 48 S.W. 3d 225, 234 (Tex. Ct. App. 2001); and Fletcher v. Ricks Explo., 905 F. 2d 890, 892 (5th Cir. 1990).

40.  As for the sale of water, no court has ruled yet whether it is goods under Section 503(b)(9). No case has ruled whether under Arizona law, water is goods.  Other states have ruled that water is goods:  **GA**: Zepp v. Mayor & Council of Athens, 348 S.E.2d 673, 676-78 (Ga. Ct. App. 1986) ("Water . . . is a thing; it exists; it is 'fairly identifiable' as a movable at the time of identification to the contract of sale."); **N.J.**: Mayor of Jersey City v. Town of Harrison, 58 A. 100, 101 (N.J. 1904) (sale of water is "contract for the sale of goods, wars, and merchandise."); **N.Y.**: Sternberg v. N.Y. Water Serv. Co., 548 N.Y.S.2d 247, 249 (N.Y. App. Div. 1989); **NC**: Mulberry-Fairplanes v. N. Wilkesboro, 412 S.E.2d 910, 915 (N.C. Ct. App. 1992); **PA**: Gall v. Allegheny County Health Dept., 555 A.2d 786, 789-90 (Pa. 1989) (water is a thing, existing, and movable; whatever can be measured by a flow meter has movability); **SD**: Dakota Pork Indus. V. City of Huron, 638 N.W.2d 884, 886 (S.D. 2002); and **VT**: Adel v. Greensprings of Vermont, Inc., 363 F.S.2d 692, 697 (D. VT. 2005); and **TX**: Moody v. City of Galveston, 524 S.W.2d 583, 586-87 (Tex. Civ. App. 1975).

### D.  Natural Gas Is "Goods"

41.  For the reasons set forth above, UNS' claim for $334.40 is well founded in fact and legal support.

//

//

//

//

//

//

//

                                    //

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

WHEREFORE, Tucson Electric Power Company and UNS Gas, Inc. respectfully:  (a) oppose the

Objection; (b) request that the Court rule in favor of the Response and grant them an allowed Section

503(b)(9) claim in the amount of $38,568.50, with payment to be made on or before the effective

date of a confirmed chapter 11 plan of reorganization; and (c) seek all such other and further relief as

is just and reasonable.

Dated:  June 29, 2009                              Respectfully submitted,

                                                                  BLASBERG & ASSOCIATES


                                                                  By: /s/Teresa A. Blasberg
                                                                       Teresa A. Blasberg
                                                                  Attorneys for Tucson Electric Power Company
                                                                  and UNS Gas, Inc.

# **EXHIBIT A**

# THE
# Law *of* Electricity

### *Including*

Electrolysis, Electrical Injuries, Powers,
Duties and Regulation of Electrical Companies,
Eminent Domain, Taxation, Electrical Contracts,
Municipal Ownership, Abutting Owners, Interfer-
ence with Currents, Injuries to Appliances,
Conduits, Street Railways, Master
and Servant and Evidence

COVERING THE DECISIONS OF THE UNITED STATES,
ENGLAND AND CANADA

By

## ARTHUR F. CURTIS

of the New York Bar, Co-editor of Street Railway Reports,
and Griffin and Curtis on Chattel Mortgages
and Conditional Sales

KF
2125
C8

ALBANY, N. Y.
MATTHEW BENDER & COMPANY
INCORPORATED
1915

(References are to pages.)

Yazoo City v. Birchett............ 89 Miss. 700................. 630
Yeager v. Edison Elec. Co........... 242 Pa. 101............602, 774, 815
—— v. Tuning,............... 79 Oh. St. 121.......466, 467
Yearsley v. Sunset Telep. & Teleg. Co. 110 Cal. 236................. 848
Yocum v. Hotel St. George Co....... 18 Abb. N. C. 340.........639, 640
Yoe v. Savannah River Power Co.... 89 S. Car. 396.............. 472
York Telep. Co. v. Keesey.......... 5 Pa. Dist. Rep. 366......20, 24, 417
Young v. Inhabitants of Yarmouth.. 9 Gray (Mass.) 386.......... 638
—— v. Town of Gravenhurst....... 24 Ont. L. R. 467......630, 631, 632
Younie v. Blackfoot Light & Water
Co. .......................... 15 Idaho, 56......602, 610, 714, 747

Z.

Zanesville, City of, v. Zanesville
Teleg. & Telep. Co.............. 64 Oh. St. 67................. 375
Zanziger v. Wayne Elec. L. Co....... 6 Pa. Dist. Rep. 577.......... 472
Zehren v. Milwaukee Elec. Ry. & L.
Co. ......................... 99 Wis. 83................... 428
Zentner v. Oshkosh Gaslight Co.... 132 Wis. 447.....814, 863, 869, 888
                                                                    919
Ziehm v. United Elec. L. & P. Co. of
Baltimore ..................... 104 Md. 48..766, 782, 801, 802, 812
                                                              813, 931
Zimmerer v. Stuart................ 88 Neb. 530................32, 331
Zimmerman v. American Telep. &
Teleg. Co. .................... 71 S. Car. 528................ 466

# THE LAW OF ELECTRICITY

## CHAPTER I.

### INTRODUCTORY.

SECTION 1. Electricity.
   2. —— Nature of.
   3. —— As Property.
   4. —— As a Subject of Larceny.
   5. Electric Companies; in General.
   6. —— As Quasi-Public Corporations.
   7. —— As Manufacturers.
   8. Street Railway Companies.
   9. Telegraph and Telephone Companies; in General.
   10. —— Contrasted.
   11. —— "Telephone" as "Telegraph."
   12. Appliances.
   13. —— As Real or Personal Property.
   14. Use of Electricity for Effecting Death of Criminals.
   15. Electrical Terms Defined.

## Sec. 1. Electricity.

The attempt to define a legal term has been spoken of as a "perylous chose."[1] With especial force does this observation apply to an attempt to formulate either a scientific or a legal definition of "electricity." No definition has been generally accepted by the scientific world, and, in the absence of one scientifically accredited, no court has attempted to frame one for legal purposes.[2] Had it been found necessary, no doubt a definition would have

1. Thayer, Preliminary Treatise, 189.

2. "But little is known of electricity. According to the definition of earlier lexicographers, it is an 'exceedingly subtle agency that pervades all space.' A consideration of the definitions given it by the more recent lexicographers leaves the mind in the same nebulous condition as to what it really is. It is seen through the results accomplished by it, and, although it has come to fill one of the greatest needs in the economies of modern life, it remains as much of a mystery as ever." Kentucky Elec. Co. v. Buechel, 146 Ky. 660, 143 S. W. 58, 38 L. R. A. (N. S.) 907.

[1]

been framed which would be satisfactory to scientists and judges. But the electrician, in the pursuit of his profession, has not required that the term "electricity" be defined. In the same way, judges have been able to determine the legal questions presented in electrical cases without laying down a definition of the term. The term "electricity" conveys to the scientist, to the judicial officer, or to the layman, the idea of a certain natural force. As thus conceived, and with no attempt at a formal definition, the term "electricity," is used in this book.

## Sec. 2. Electricity, Nature of.

Though cautious in presenting a definition of "electricity," no hesitancy has been evinced in theorizing as to the nature of such force.

Scientifically speaking, the true nature of electricity is as yet not well understood.[3] It was thought by Benjamin Franklin to be a single fluid, while later philosophers considered it to be composed of two fluids (one positive and one negative), which were contained in neutral bodies in equal amounts. Both fluid theories are now discarded, and the general opinion of the present-day scientists is that electricity is ether in motion or is the result of a state of strain or other manifestation therein.[4]

---

3. "The true nature of electricity is as yet not well understood; but it is probable that it is not, as was formerly assumed, of the nature of a fluid — either a single fluid, as was supposed by Franklin, or two fluids (positive and negative), as was supposed by Symmer." Century Dictionary, Electricity.

4. "The action of electricity led many experimenters who lived long after Gilbert to the belief that it was a fluid which was not perceptible to their senses. Our own great philosopher and statesman, Benjamin Franklin, assumed it to be a fluid, and bodies which exhibited electrical manifestations were thought by him to contain either more or less than a normal amount of the fluid. A Frenchman named Dufay and an Englishman named Symmer considered electricity to be composed of two fluids which were contained in neutral bodies in equal amounts. When by any means this equality was disturbed in a body, electrical manifestations occurred. These theories, and a large number similar to them that were promulgated, are now discarded in the light of later scientific knowledge. But the conception of the fluid theory is very useful in giving a clear understanding of some

---

Judicial Nature.— Fortunately, courts are not called upon to determine whether the phenomenom of electricity is the result of ether in motion or whether it is a fluid entity. The problem of the judiciary is to classify it properly, that is, to give it its proper place among the substances and forces used by man. In this undertaking the courts have no difficulty. So dangerous a force as electricity must legally be considered in the same class as high explosives and other treacherous and destructive agents.[5] It is recognized as a silent, insidious, powerful and dangerous agency, the power and manifestations of which are fully comprehended only by experts.[6] It might be improper to

---

of the phenomena of electricity. It is now generally accepted that the phenomena to which we give the name electricity result from a state of strain or other manifestation in the ether." Jackson, Electricity and Magnetism, p. 2.

"We have still before us the question — What is electricity? In the light of what has gone before, this question, unqualified, now presents no difficulty to us. The answer is simplicity, it is:—

A. There is no such distinct entity. If the question is qualified a little, and put in a slightly different form, it is possible to answer it more explicitly.

Q. What is the cause of the effects that are known as electrical? We may answer —

A. All the effects which are known as electrical, are directly caused by explicit motion of the smallest single bodies of which we have any direct or inferential knowledge." Verschoyle, Electricity, What is? p. 163.

"What shall we therefore answer to the question, What is Electricity? Must we reply, *Ignoramus ignorabimus* — (we are ignorant, and we shall remain ignorant)? We have already

strong grounds for believing that we live in a medium which conveys to-and-fro or periodic movements to us from the sun, and that these movements are electro-magnetic, and that all the transformations of light and heat, and indeed the phenomena of life, are due to the electrical energy which comes to us across the vacuum which exists between us and the sun — a vacuum which is pervaded by the ether, and which is a fit medium for the transmission of the electromagnetic waves." Trowbridge, What is Electricity? p. 308.

5. "Electricity is to be classed with gunpowder, dynamite, and other treacherous and destructive agents." Warren v. City Elec. Ry. Co., 141 Mich. 298, 4 St. Ry. Rep. 487, 104 N. W. 613, 9 Am. Electl. Cas. 627, 12 Det. Leg. N. 415.

As to the degree of care to be used by one having a dangerous current of electricity under his control, see §§ 400–406.

6. Alabama.— "Electricity is an illusive, in a degree uncontrollable, and a dangerous, element." Birmingham Ry. L. & P. Co. v. Canfield, (Ala.) 59 So. 217.

Colorado.— "It is a subtle, im-

say that it is an unknown force, but it is a mysterious power in that its exact nature is not known.[7] Though its exact

ponderable, death dealing element or fluid. Denver Tramway Co. v. Reid, 4 Colo. App. 53, 4 Am. Electl. Cas. 332, 35 Pac. 269.

Florida.— See Jacksonville Elec. L. Co. v. Sloan, 52 Fla. 257, 9 Am. Electl. Cas. 891, 42 So. 516.

Illinois.— "Electricity is a subtle and powerful agent." Commonwealth Electric Company v. Melville, 210 Ill. 70, 9 Am. Electl. Cas. 95, 70 N. E. 1052.

Indiana.— "Courts of all jurisdictions recognize the mysterious and subtle character and extreme danger of the agency here involved, and the importance of and necessity for some knowledge of it on the part of those who are required to expose themselves to its dangers." Lyons v. City of New Albany, (Ind. App.) 103 N. E. 20. "Electricity is an agent of the greatest danger, and of a secret deadly character." Cumberland Teleph. & Teleg. Co. v. Krans, 48 Ind. App. 67, 95 N. E. 371.

Kentucky.— "Electricity is a powerful and deadly agency. It cannot be seen and is as silent as it is deadly." Union Light, Heat & P. Co. v. Lakeman, 156 Ky. 33, 160 S. W. 723. "Electricity is a dangerous and deadly thing. It is a substance that gives no warning of its presence." Paducah Light & P. Co. v. Parkman's Adm'r, 156 Ky. 197, 160 S. W. 931. "Electricity is the most powerful and dangerous element known to science. It cannot be seen, and it is as silent as it is deadly." Overall v. Louisville Electric Light Co., 10 Ky. Law Rep. 759, 7 Am. Electl. Cas. 521, 47 S. W. 442.

Minnesota.—Electricity is a "silent, deadly, and instantaneous force." Musolf v. Duluth Edison Elec. Co.,

108 Minn. 369, 122 N. W. 499, 24 L. R. A. (N. S.) 451.

Missouri.— "Electricity is, perhaps, the most insidious, as well as the most destructive, of the natural forces of which we are cognizant, and have availed ourselves in the interest of the civilization of this age. It is insidious because it only manifests itself in the exercise of its destructive force. It is hidden from all the senses which constitute human apprehension until it strikes, and then its blow is so deadly that in many jurisdictions it has been selected by law as the surest and quickest, and therefore the most painless, instrument available for the destruction of human life in case of judicial executions." Campbell v. United Rys. Co. of St. Louis, 243 Mo. 141, 8 St. Ry. Rep. 626, 147 S. W. 788. "Electricity is one of the most dangerous agencies ever discovered by human science." Geissmann v. Missouri Edison Elec. Co., 173 Mo. 654, 8 Am. Electl. Cas. 569, 73 S. W. 654.

North Carolina.—The defendant company was engaged in the business of manufacturing, producing, leasing and selling light made from the use of electricity, which is the most deadly and dangerous power recognized as a necessary agency in developing our civilization and promoting our comfort and business affairs. It differs from all other dangerous utilities. Its association is with the most inoffensive and harmless piece of mechanism — if wire can be classified as such — in common use. In adhering to the wires, it gives no warning or knowledge of its deadly presence. Vision cannot detect it. It is without color, motion, or body. Latently, and without sound, it

---

nature is unknown, it is not so as to its qualities and manifestations.[8] Many of these are so well known that courts take judicial notice thereof.[9]

## Ignorance of Scientific Nature Recognized by Courts.—

The fact that the exact nature of electricity is scientifically unknown is recognized by the courts.[10] Thus, in one case,[11] it was said: "Cicero was asked, 'What is life?' He

exists, and, being odorless, the only means of its discovery lies in the sense of feeling, communicated through the touch, which, as soon as done, becomes its victim. Mitchell v. Raleigh Elec. Co., 129 N. C. 166, 7 Am. Electl. Cas. 644, 39 S. E. 801, 55 L. R. A. 398, 85 Am. St. Rep. 735.

Wisconsin.— "The electric force is the most powerful and dangerous agency of nature, and, even when restrained or controlled by the most perfect machinery and appliances, its high-tension currents are extremely dangerous in many directions." State ex rel. Wisconsin Telep. Co. v. Janesville St. R. Co., 87 Wis. 72, 4 Am. Electl. Cas. 289, 57 N. W. 970, 22 L. R. A. 759, 41 Am. St. Rep. 73; Carroll v. Grand Ronde Elec. Co., 47 Oreg. 424, 4 St. Ry. Rep. 908, 9 Am. Electl. Cas. 642, 84 Pac. 389, 6 L. R. A. (N. S.) 290.

7. "Electricity is a mysterious power, but in many of its common manifestations is not, and has not been for many years, an unknown force." Johnston v. New Omaha Thomson-Houston Elec. L. Co., 114 Neb. 772, 113 N. W. 526.

8. Divisibility recognized by courts. — "The nature of electrical power is such that it can be indefinitely subdivided and readily transmitted to great distances for use by any number of people for purposes now recognized and innumerable others which the future will certainly disclose." Minnesota Canal & Power

Co. v. Koochiching Co., 97 Minn. 429, 9 Am. Electl. Cas. 708, 723, 107 N. W. 405, 5 L. R. A. (N. S.) 638.

9. §§ 583, et seq.

10. "The nature, characteristics, and apparent vagaries of electricity by no means are perfectly understood in the science of the present day." Brown v. Consolidated Light, Power & Ice Co., (Mo. App.) 109 S. W. 1032.

What it is, is simply a matter of speculation, for no one has ever seen it. It has been called a fluid, a form of radiation, an induced condition, and perhaps many other things, each of which is as far from expressing a true comprehension of its constitution as the others. All we know of it is that experts in the science have found certain phenomena following certain conditions, and have applied them to many useful purposes in the arts and industries; but our knowledge of the subject is still so limited that we must rely on these experts for information as to the conditions which mean life or death to those who come in contact with them. Campbell v. United Rys. Co. of St. Louis, 243 Mo. 141, 8 St. Ry. Rep. 626, 147 S. W. 788.

11. Louisville Bagging Mfg. Co. v. Central Passenger Ry. Co., (Ky.) 3 Am. Electl. Cas. 236; affd., 95 Ky. 50, 4 Am. Electl. Cas. 202, 23 S. W. 592, 15 Ky. Law Rep. 417, 44 Am. St. Rep. 203.

answered, '*Animus ignis vel spiritus nescio.*' And so of electricity. It is as mysterious as the mind that tries in vain to comprehend it. It is impossible that we should know anything of it beyond the phenomena which it exhibits. Its physical character, its essence, its constitution and absolute nature can never be known to man. Whether it is an impulse, a tendency, a power, energy or force— whatever it is—all that man can know of it is the physical fact that under certain conditions by certain complicated material processes, which his inventive genius has devised for developing into active agency this impalpable, gigantic energy of nature which fills the universe and is so essential to its magnificent harmony, it will produce certain results and develop certain powers. Without knowing its essence, man has learned, by cunning mechanism, how to direct its wonderful energy. It is of a kin, no doubt, to all the members of the family of physical mysteries with which we can never form acquaintance, and of which we know nothing beyond their phenomena. The wind, the influence of planetary bodies upon the tides, gravitation and magnetism, the forces of repulsion and attraction, are its contemporaries in the physics of the material universe. That these invisible agencies of nature are in continuous and tremendous operation we can not doubt; but what they are, or what are the causes and purposes of their operation, we can never know, any more than we can understand the principles upon which the invisible Ruler drives the wondrous machinery of His universal government across the ocean of time. *Felix qui potuit rerum cognoscere causas.''*

### Sec. 3.  Electricity as Property.

Electricity, being invisible to the senses, cannot be handled in the same manner as potatoes, furniture or other articles of personal property. From its imperceptibility to the senses, it might be claimed that it was not property within the meaning of that term as used in jurisprudence. On the other hand, it is continuously bought, sold, measured, and delivered as efficiently as wheat or any other commodity. In spite of its invisibility, electricity is con-

sidered in law as personal property[12] subject to ownership, sale and disposal as inanimate objects.[13] It has a substance which may be measured.[14] And one, having the ownership and possession of an electric wire, may properly be said to have possession of the electricity with which the wire is charged.[15]

**As a Supply.**—It has been held that electricity furnished to a mine is a " supply " as that term is used in a statute giving a lien on mines to any person furnishing " supplies " for the working or development of such.[16]

### Sec. 4.  Electricity as a Subject of Larceny.

Inasmuch as electricity is property which may be owned, used, and controlled, no reason is apparent why it cannot be subject of larceny. Gas, which is but slightly, if any, more tangible than electricity, has been held to be the subject of larceny.[17] Likewise, it has been thought that the unlawful appropriation of telephone service may be larceny.[18]

12. Terrace Water Co. v. San Antonio L. & P. Co., 1 Cal. App. 511, 9 Am. Electl. Cas. 505, 82 Pac. 562; Fickeisen v. Wheeling Electrical Co., 67 W. Va. 335, 67 S. E. 788, 27 L. R. A. (N. S.) 893.

13. Hill v. Pacific Gas & Elec. Co., 22 Cal. App. 788, 136 Pac. 492; Fickeisen v. Wheeling Electl. Co., 67 W. Va. 335, 67 S. E. 788, 27 L. R. A. (N. S.) 893, wherein it was said: " Wherein does the sale of this electricity differ from a sale of other commodities or things? It is personal property, capable of sale."

14. Fickeisen v. Wheeling Elec. Co., 67 W. Va. 335, 67 S. E. 788, 27 L. R. A. (N. S.) 893.

15. Fickeisen v. Wheeling Elec. Co., 67 W. Va. 335, 67 S. E. 788, 27 L. R. A. (N. S.) 893.

16. Grants Pass Banking & T. Co. v. Enterprise Mining Co., 58 Oreg. 174, 113 Pac. 859, 34 L. R. A. (N. S.)

395, wherein it was said: " Mines which a few years ago were almost worthless have, by the employment of electricity, become very valuable, affording profitable employment to laborers and yielding rich returns to the owners. Electricity is capable of propelling machinery and of illuminating mine and mill by continuous operation, and as this modern agent is consumed by its use, so far as susceptible of discernment, and supplies a very urgent need tending to the proper working and development of a mine, it is believed that such force is a supply within the scope of that term and for the use of which a lien may fairly be implied from the statute."

17. Woods v. People, 222 Ill. 293, 78 N. E. 607, 6 Ann. Cas. 736.

18. Law Notes, January, 1914, page 183.

# EXHIBIT B

Westlaw.

Slip Copy                                                                 Page 1
Slip Copy, 2008 WL 2520107 (Bkrtcy.E.D.Ky.)
(Cite as: 2008 WL 2520107 (Bkrtcy.E.D.Ky.))

**H**
Only the Westlaw citation is currently available.
United States Bankruptcy Court, E.D. Kentucky,
Lexington Division.
In re SAMARITAN ALLIANCE, LLC d/b/a
Samaritan Hospital, et al., Debtors.
No. 07-50735.

June 20, 2008.

Bunch & Brock, Joseph H. Miller, Samuel G.
Carneal, Steve Price, W. Thomas Bunch, II, W.
Thomas Bunch, Sr., Lexington, KY, for Debtors.
Rachelle C. Williams, Lexington, KY, for U.S.
Trustee.
Frost Brown Todd LLC, Adam R. Kegley, Lexing-
ton, KY, Ronald E. Gold, Frost Brown Todd LLC,
Cincinnati, OH, for Creditor Committee.

### MEMORANDUM OPINION

WILLIAM S. HOWARD, Bankruptcy Judge.
*1 This matter is before the court on the Amended
Application for Allowance of an Administrative
Expense Claim ("the Application") (Doc. # 574)
filed by creditor Kentucky Utilities Company
("KU"), and the Objection (Doc. # 583) thereto by
the Liquidating Debtor ("the Debtor"). KU filed its
Response to Liquidating Debtor's Objection to Ap-
plication for Allowance of an Administrative Claim
("the Response")(Doc. # 606), and the matter was
heard on February 14, 2008. Pursuant to an Order
of Submission (Doc. # 637) entered on March 3,
2008, the matter was taken under consideration for
decision.

### 1. Factual and procedural background

The parties have entered into a Stipulation Con-
cerning Issues in Controversy for Hearing of Ken-
tucky Utilities' Motion to Allow Administrative
Claim (Doc. # 604). It provides as follows:

1. The Debtor filed a voluntary petition for relief
under Chapter 11 of the United States Bank-
ruptcy Code on or about April 16, 2007 (the
"Petition Date").

2. KU timely filed an unsecured claim against the
Debtor and its estate in the amount of
$63,690.58, less any applicable credits, of which
amount it asserts that $35,067.59 is allowable as
an administrative claim with priority pursuant to
11 U.S.C. § 507(a)(2).

3. On or about December 19, 2007, KU timely
filed its Application for Allowance of An Admin-
istrative Expense Claim (D.I.569) as amended
(D.I.574) ( "KU's Motion"). KU's Motion seeks
allowance of an administrative claim in the
amount of $35,067.59, representing the value of
electricity provided to the Debtor during the 20
days immediately preceding the Petition Date,
pursuant to 11 U.S.C. § 503(b)(9). The Debtor
has filed its Objection to this Application.

4. KU and the Debtor hereby stipulate that the
value of the electricity provided by KU to the
Debtor during the 20 days immediately preceding
the Petition Date is $35,067.59.

5. The Debtor and KU hereby stipulate that the
electricity provided by KU to the Debtor during
the 20 days immediately preceding the Petition
Date was sold to the Debtor in the ordinary
course of the Debtor's business.

6. KU and the Debtor disagree on whether the
provision of such electricity by KU to the Debtor
constitutes 'goods received' so as to qualify as an
administrative expense priority claim under 11
U.S.C. § 503(b)(9)[.]

After the Petition Date the Debtors continued to op-
erate Samaritan Hospital as debtors-in-possession
until June 6, 2007, when the University of Ken-
tucky took control of hospital operations pursuant
to the Sale Order (Doc. # 234). The Debtors'

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                Page 2
Slip Copy, 2008 WL 2520107 (Bkrtcy.E.D.Ky.)
(Cite as: 2008 WL 2520107 (Bkrtcy.E.D.Ky.))

Amended Plan of Orderly Liquidation and Distribution (Doc. # 481) was confirmed on November 9, 2007 with the entry of the Order of Confirmation (Doc. # 512).

## 2. *Discussion*

KU's Application seeks $35,067.59 as an administrative expense claim for goods, in the form of electricity, it provided to the Debtor. It makes this claim pursuant to Bankruptcy Code section 503(b)(9), which provides that a creditor will be allowed an administrative expense claim for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."11 U.S.C. § 503(b)(9). As set out above, the Debtor disputes the characterization of electricity as " goods."

*2 The Debtor argues that KU provides "services," not "goods," and that section 503(b)(9) only applies to goods, pointing out that the Code does not define goods, but uses the terms "goods" and "services" in different contexts. The Debtor argues that electricity is not considered " goods" under the generally accepted use of the term, and further contends that section 503(b)(9) was not intended to incorporate services provided, making reference to that section's interplay with section 546(c).

In support of its position concerning whether electricity may be defined as " goods," the Debtor cites *G & K Dairy v. Princeton Elec. Plant Bd.,* 781 F.Supp. 485 (E.D.Ky.1991), a products liability case in which the court dealt with so-called "stray voltage" which had harmed a farmer's dairy herd, and determined that stray voltage is not a product. *Id.* at 489.In contrast, KU cites *Bryant v. Tri-County Elec. Membership Corp.,* 844 F.Supp. 347 (W.D.Ky.1994), for its holding that "ordinary electricity" is a product in the strict products liability context. *Id.* at 352.

The Debtor also cites *Buckeye Union Fire Ins. Co. v. Detroit Edison Co.,* 38 Mich.App. 325, 196 N.W.2d 316, Mich.App., (1972) in which the court stated that electricity was not a good, but did apply an implied warranty to the sale of services such as the sale of electricity. In *Encogen Four Partners, L.P. v. Niagara Mohawk Power Corp.,* 914 F.Supp. 57 (S.D.N.Y.1996), the court held that the U.C.C. did not govern contracts for the sale of electricity because "[u]nder New York law, ..., the sale of electricity does not constitute a sale of goods, but a service." *Id.* at 61.

KU contends that many courts have concluded that electricity sold by a utility is a good or product. It cites *Kentucky Elec. Co. v. Buechel,* 146 Ky. 660, 143 S.W. 58, Ky. (1912), in which the court held that electricity was a manufactured product, and *City of Princeton v. Princeton Elec. Light & Power Co.,* 166 Ky. 730, 179 S.W. 1074, Ky. (1915), in which the court discussed the production and sale of electricity as a commercial product. KU reasons that because electricity is a manufactured product, it must be a good.

KU also cites cases from other jurisdictions, some holding that electricity is a product for purposes of strict product liability. *See, e.g., Houston Lighting & Power Co. v. Reynolds,* 765 S.W.2d 784, Tex. (1988); *Smith v. Home Light & Power Co.,* 734 P.2d 1051, Colo. (1987); and *Schriner v. Public Serv. Elec. and Gas Co.,* 348 Pa.Super. 177, 501 A.2d 1128, Sup.Ct. Penn. (1985). Other cases KU cites hold that electricity is a good for purposes of the UCC. *See, e.g., Enron Power Mktg., Inc. v. Nev. Power Co.,* 2004 WL 2290486, at *2 (S.D.N.Y.2004); *Grant v. Sw. Elec. Power Co.,* 20 S.W.3d 764, Tex. Ct.App. (2000); and *Cincinnati Gas & Elec. Co. v. Goebel,* 28 Ohio Misc.2d 4, 502 N.E.2d 713, Ohio Mun. Ct. (1986).

The Debtor contends that electricity cannot be considered goods under the UCC because it is not specifically identifiable before it passes through a meter. As set out by the Debtor in its Brief in Support of its Objection

**\*3** [e]lectricity ... travels in an unconsumable state via high-voltage lines before its conversion by the utility company into a consumable 110 voltage. The 110 voltage is then transmitted further and ultimately delivered to a meter for on-demand usage by consumers. The electricity thus sold to and used by consumers cannot be identified prior to its delivery, i.e., passing through a meter, or after delivery. Thus, electricity is not 'fairly identifiable ...*before* the contract is performed' and therefore cannot be considered 'goods' under the UCC. *Official Comment,* U.C.C. Sales § 2-105 (emphasis added).

KU points out that the Official Comment quoted from above more completely provides that "[t]he definition of goods is based upon the concept of movability ... It is not intended to deal with things which are not fairly identifiable **as movables** before the contract is performed."UCC § 2-105, Official Comment § 1 (emphasis added). KU argues that electricity is clearly movable and fairly identifiable to a party to a contract as a movable thing being sold.

Finally, the Debtor contends that section 503(b)(9) cannot be extended to incorporate services provided. It points out that Congress chose not to include any reference to the value of **services** performed by creditors who make 20-day claims pursuant to that section. The Debtor raises the issue of the application of Code section 546(c), which authorizes a seller of goods to obtain reclamation of those goods by following the procedure set out in the statute, and contends that "goods" means merchandise or inventory that can be reclaimed. Section 546(c)(2) provides that sellers of goods who fail to provide the notice required in its paragraph (1) "still may assert the rights contained in section 503(b)(9)."11 U.S.C. § 546(c)(2).

The Debtor contends it is clear that section 503(b)(9) was created to work in tandem with section 546(c), as the option of filing a 20-day claim provides a monetary alternative, i.e., "the value of any goods," to a creditor's reclamation rights. 11

U.S.C. § 503(b)(9). The Debtor points out that a creditor's reclamation rights prevent a debtor from stockpiling assets as it descends into bankruptcy. Since electricity cannot be stockpiled (this argument neglects storage in a battery or capacitor), it does not have the same potential to benefit the bankruptcy estate that inventory or merchandise would. The Debtor therefore maintains that KU's Application does not fit into the section 503(b)(9)-section 546(c) framework and that it should not be permitted in any manner other than a general unsecured claim.

At oral argument on this matter, debtor's counsel pointed out that the provisions of section 503 apply also to other chapter proceedings under the Bankruptcy Code. Specifically, if KU is correct, utilities such as KU would have administrative claims for the appropriate portion of their claims in all cases under Chapters 7 and 13 involving business debtors. It seems unlikely that Congress intended such a fundamental change to administrative claims effecting so many bankruptcy cases in the absence of clearer language.

**\*4** Having considered the arguments of the parties, the court concludes that while courts are divided on the general question of whether or not **electricity** is " **goods**," the court agrees with the Debtor that section 503(b)(9) is not applicable here and that the electricity provided is more properly characterized as a "service." The court therefore finds that KU's Amended Application for Allowance of an Administrative Expense Claim should be overruled. An order in conformity with this opinion will be entered separately.

Bkrtcy.E.D.Ky.,2008.
In re Samaritan Alliance, LLC
Slip Copy, 2008 WL 2520107 (Bkrtcy.E.D.Ky.)

END OF DOCUMENT

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 526 N. Juanita Ave, Los Angeles, CA 90004.

A true and correct copy of the foregoing document described RESPONSE OF TUCSON ELECTRIC POWER COMPANY AND UNS GAS, INC. TO THE DEBTOR'S OBJECTION AND MOTION TO DISALLOW THEIR SECTION 503(b)(9) CLAIM will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On June 29, 2009, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

| | |
|---|---|
| Debtor AFC Acquisition Corp., c/o David S. Kupetz. Esq. | dkupetz@sulmeyeriaw.com |
| Debtor AFC Acquisition Corp., c/o Marcus Tompkins, Esq. | mtompkins@sulmeyerlaw.com |
| Debtor AFC Acquisition Corp., c/o Steven F. Werth, Esq. | swerth@sulmeyer1aw.com |
| Debtor AFC Acquisition Corp., c/o Tamar Kouyoumjian, Esq. | tkouyoumiian@sulmeyeriaw.com |
| Office of the U.S. Trustee, c/o Russell Clementson, Esq. | russell.clementson@usdoj.gov |
| Official Committee of Unsecured Creditors, c/o Alan I. Nahmias, Esq. | anahmias@mlrmanbubman.com |
| Simmons Bedding Company, c/o Scott C Clarkson, Esq. | scfarkson@lawcgm.com |
| Simmons Bedding Company. c/o Eve A. Marsella. Esq. | emarsella@lawcgm.com |
| Tanager Company, c/o David B. Shemano, Esq. | dshemano@pwkllp.com |
| Wells Fargo Retail Finance, LLC, c/o Wayne R. Terry, Esq, | wterrv@hemar-rousso.com |
| WWW AHF Partners, LLC c/o Lawrence G. Campitiello, Esq. | campitiello@shlaw.com |

☐ Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

The Honorable Barry Russell, United States Bankruptcy Court, 255 E. Temple St., Room 1668, Los Angeles, CA 90012

☐ Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ ____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐            Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 6/29/09 | Teresa A. Blasberg | /s/Teresa A. Blasberg |
|---|---|---|
| _Date_ | _Type Name_ | _Signature_ |